UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MALCOLM WADE, individually and
on behalf of all others similarly situated,

        Plaintiffs,

                                     Case No. 2:10-cv-270
                                     JUDGE SARGUS
    v.                                 Magistrate Judge Abel

WERNER TRUCKING CO. a/k/a
WERNER ENTERPRISES, INC.,

        Defendant.

## OPINION AND ORDER

This case is before the Court on cross motions for summary judgment (Docs. 122, 123), Defendant's motion to dismiss opt-in plaintiffs who failed to respond to discovery (Doc. 112), and Plaintiff's motion to strike affidavits (Doc. 135). For the reasons that follow, Plaintiffs' motion to strike is **DENIED**, Plaintiffs' motion for summary judgment is **GRANTED in part and DENIED in part**, Defendant's motion for summary judgment is **GRANTED in part and DENIED in part**, and Defendant's motion to dismiss is **DENIED**.

## I.    INTRODUCTION & POSTURE

Defendant, Werner Enterprises, Inc., is a trucking company. (Doc. 121, Ex. 8, Dittberner Depo. at 9:2-9:6). In Werner's hierarchy, truck drivers are the line employees. *Id.* at 23:8-23:9. Overseeing the truck drivers are fleet coordinators. *Id.* at 23:6-23:7. Parallel with fleet coordinators are fleet managers; the only significant difference between the two is that fleet coordinators work the night shift. (Doc. 121, Ex. 1, Andresen Depo. at 29:19-29:24). Above fleet coordinators and managers are dedicated managers and supervisors, then directors, and then

vice presidents. (Doc. 121, Ex. 8, Dittberner Depo. at 22:12-23:21). Werner also has two faces to its business – a dedicated side that has employees who only deal with a single large customer and an operations side or asset side that hauls a variety of different customers' loads. (Doc. 121, Ex. 16, Welton Depo. at 8:17-8:21). This lawsuit concerns fleet coordinators and fleet managers on both sides of the business.

Plaintiff, Malcolm Wade, brings suit on his own behalf and on behalf 111 of his fellow current and former fleet coordinators and fleet managers.[1] He alleges that Werner violated the Fair Labor Standards Act (FLSA) and Ohio Minimum Fair Wage Standards Act (OMFWSA) when it failed to pay him and his fellow plaintiffs overtime wages for hours worked by them in excess of 40 per week. (Doc. 30, Amend. Compl. *in passim*); *see also, e.g.*, 29 U.S.C. § 207 (2012); Ohio Rev. Code § 4111.03 (2007). Plaintiffs all claim (and Werner does not dispute)[2] that they generally worked in excess of 40 hours per week.[3] *See infra* pp. 4-13. Yet, Werner

---

[1] There is some confusion on the docket about how many plaintiffs are in this case. The numbering of plaintiffs in Plaintiffs' opt-in notices proceeds in proper order from 1 to 90. Then it jumps to 100 and proceeds to 113. Then it backtracks to 112 and counts to 114. Then it begins again at 105 and continues to 118. Three of the listed plaintiffs have withdrawn from the class and five plaintiffs are listed twice. Thus, the true number of Plaintiffs is 112: Malcolm Wade, Reginald Alexis, Ben Anderson, Josephine Atkins, Rayshawn Baker, Rachel Bramblett, Matthew Brewer, James Brown, Alan Cannon, Joseph Casper, Wendy Christian, Parrish Coisman, Robert Cook, Andrew Costanzo, Chad Duke, Alexandre Ely, Michael Foley, Brandon Garrels, Scott Groves, Brett Hahn, Brenda Hampton, Drew Jones, Jeff Kalar, Jeremy Klein, Curtis Kubiak, David Lacey, Mike Lagana, Alan Mantegna, Bradley McKibben, Wayne Mertens, Gram Mether, Maria Mozzone, Scott Murchie, Debra Myers-James, Danielle Neemann, Ryan O'Connor, Steven Ostdiek, Trent Owens, Clinton Powell, Becky Richmond, Bryan Russell, Charles Sanduski, Karen Saunders, Shirley Schuh, Joshua Snell, Troy Sohn, Andrew Wills, William Wirth, Kellie Wunsch, Brandon Autrey, Stephen Dean, John Dozier, Colin Martin, Annie Harris, Peter Mariash, Lindsey McCall, James Efaw (via Administrator of the Estate of James Efaw), Jared Pitts, Connie Elliott, Paul Cerny, Brandon Bonicard, Ross Bradley, III, John Cannon, Lorraine Casto, Christopher Davies, Jeffery Davis, Charles Doan, Dan Eledge, Larry Graff, Wendy Halloran, Andrea Harding, Edgar Hargrave, Jr., Dorrel Harve, Ryan Heck, Sharresse Henderson, James Horne, Jr., Neil Kitchen, Malisa Knapp, Derrick Lindeman, Kyle Lindeman, Sally McAvoy, June Mitchell, William Molina, Joseph Ogier, Kelly Oliveri, John Oliveri, George Phillips, Jr., James Price, III, David Prokupek, Kyle Racette, Ruth Rutherford, Kristy Snodgrass, Brett Townsend, Christopher Williams, Lucas Cameron, Charles Mandler, Clifford Birkheiner, Gary Hamilton, Todd Bomberger, Shannon Kersting, Alexander Morris, Frank Butts, Graham Rodery, Sherri Gilbert, Harvey Swartzel, Clint Miller, Tony Wulkow, Liliana Murillo Hurtado, Todd Ray Burnham, Benjamin D. Salzinger, Christopher R. Weber, and Jared Brill.

[2] Werner does, however, raise issues regarding computing and proving differences in how many hours Plaintiffs worked in excess of 40 for each of the different plaintiffs.

[3] This is not to imply that every plaintiff worked every week in excess of 40. Some, for example, were on schedules where they would work 84 hours one week and be off the next.

never paid any sort of overtime to the Plaintiffs because Werner believed them to be exempt employees under the acts. (Doc. 121, Ex. 13, Polenz Depo. at 25:19-26:5). Hence, Plaintiffs' case succeeds or fails based on their classification – exempt or not.

In order to classify the employees, the Court must determine what the record shows about what tasks were performed for Werner by Plaintiffs in their roles of fleet coordinator/manager. The Court is required to ascertain whether that issue is genuinely in factual dispute and, if not, whether there is a clear enough answer about what tasks Plaintiffs performed to enable the Court to decide whether, as a matter of law, they are exempted from the FLSA and OMFWSA. Accordingly, a detailed review of the evidence before the Court is necessary.[4]

Plaintiffs have taken the position that the evidence before the Court is representative of the whole and that a summary judgment decision as to one should be the decision as to all. (Doc. 122, P. Mot. for SMJ at 2 n.2). Though it appears that the Plaintiffs share a number of significant commonalities which may ultimately make Plaintiffs, or a subset thereof, suitable for trial as a class, the summary judgment record presented here does not prescribe a monolithic result that could legitimately be applicable to all class members. Because of this, and because deciding the exemption questions presented requires a detailed record, the Court will not, at this juncture, decide summary judgment as to plaintiffs who have not been deposed and regarding whom there is little evidence in the record.[5] The summary judgment decision announced herein.

---

[4] This evidence takes the form, primarily, of numerous depositions. Though Defendant has also submitted affidavits, resumes, performance evaluations, and other documents relating to the deponents, these shall not be separately cited herein because they were generally discussed within the depositions and thus, a separate discussion would be superfluous.

[5] In addition to records relating to deponent plaintiffs, Defendant submitted performance evaluations, internal resumes, interrogatory responses, and/or affidavits for non-deponent plaintiffs and, in the case of Rick Guerrieri, a non-deponent potential plaintiff. (Doc. 124, Exs. R-W, EE, HH, OO-QQ, SS, UU, ZZ, AAA-HHH) (documents pertaining to: Gram Mether, Michael Foley, Rachel Bramblett, Frank Butts, David Lacey, Todd Burnham, Wendy Christian, Chad Duke, Bryan Russell, Rayshawn Barker, Rick Guerrieri, and Andrew Costanzo). However, determining exemptions to the FLSA is a fact-intensive inquiry and these documents, which are not accompanied by

therefore, only applies to the 10 Plaintiffs who have been deposed: Malcolm Wade, Mathew Brewer, James Brown, John Cannon, Joseph Casper, Robert Cook, Stephen Dean, Neil Kitchen, Joseph Ogier, and Troy Sohn.

## II.    FACTS IN THE SUMMARY JUDGMENT RECORD

### A. Plaintiffs' Witnesses – Fleet Managers and Fleet Coordinators

Wade, as mentioned, is the plaintiff who initiated this lawsuit. Werner hired him as a dedicated night fleet coordinator (off-hours fleet manager) for their Staples account in London, Ohio, effective August 9, 2004. (Doc. 121, Ex. 15, Wade Depo. at 18:19-19:3, 37:5-37:11). He received a base salary of approximately $35,000 per year while at Werner and, though he received raises and bonuses, the salary was not dependent on the hours worked and remained the same whether or not he exceeded 40 hours in any given week. *Id.* at 19:4-20:7. His typical hours were 4 p.m. to 4 a.m. (or after) for a total of approximately 60 hours per week. *Id.* at 26:22-27:3, 84:5-84:8. The bonuses he received were, to his knowledge, based on operating efficiencies, safety, and timely delivery of his group of drivers. *Id.* at 24:23-25:1, 34:10-34:12. In his fleet coordinator role, Wade was generally accountable for the safe delivery of products from the Staples facility to the store. *Id.* at 33:21-34:12. In fact, as mentioned, his bonuses were based on his efficacy as a manager and, therefore, Wade was empowered to take a number of steps to ensure on-time and safe deliveries. For example, in the event of a breakdown, Wade would

---

explanatory (or authenticating) depositions or even declarations, lack the requisite level of detail to enable the Court to gain the necessary understanding of the duties the person in question performed at Werner. For example, Gram Mether's interrogatory provides no information about his job duties and his internal resume limits its account of his responsibilities as a night coordinator to the following, "Monitor critical loads to ensure safe on time delivery and providing solutions to potential late deliveries. Manage drivers to help them and the company reach a high level of productivity." (Doc. 124, Ex. FF, Mether Resume at 2; Doc. 124, Ex. R, Mether Rogs. *in passim*). It also bears mention that Plaintiffs submitted a number of interrogatory responses by non-deponent plaintiffs as exhibits to Plaintiffs' response to Defendant's motion to decertify the class. (Doc. 136, Exs. 1-21). As this order does not address certification and as Plaintiffs do not seek to rely on these documents in requesting or defending against summary judgment, these interrogatories also shall not be considered herein.

4

reroute trucks or rearrange the loads to make sure the route was covered. *Id.* at 29:16-31:4. In order to obtain the equipment resources to manage this, he would reach out to his superior, Al Gaston, or an off-hours management team at Werner's headquarters in Omaha. *Id.* In the event that, during a pre-inspection before setting out on his route, a driver noticed there was something wrong with their truck or trailer, Wade was the contact person. *Id.* at 38:3-38:6. In the case of, for instance, a damaged trailer, Wade would deal with the issue by ordering that the load be switched with a replacement trailer and then arranging for service for the broken trailer. *Id.* at 38:3-40:18. In the event that Wade could not manage to repower or reassign a load[6] or otherwise deal with any eventuality that occurred, he would call Staples and inform them of the late load. *Id.* at 32:21-33:8, 62:3-63:12. He would also, on occasion, advise drivers of foul weather and attempt to steer them around it. *Id.* at 91:16-91:23. He posted safety notices and reminded drivers to do their preventative maintenance as well as quarterly safety training. *Id.* at 33:13-33:17, 50:18-52:1, 120:9-121:5. If drivers did not complete their quarterly safety training Wade would remove them from the schedule. *Id.* at 102:1-102:17. If drivers did not have enough remaining Department of Transportation (DOT) driving hours[7] to complete a route he would schedule or reschedule them (possibly with a second driver) accordingly. *Id.* at 99:7-99:24. Wade lacked the power to unilaterally fire drivers, but he would discipline them through counseling and by forwarding recommendations regarding termination to his superior. *Id.* at 103:5-105:12. In short, he managed drivers, planned loads, scheduled drivers, worked with drivers on safety issues, and worked with the customer to maintain a good relationship between

---

[6] Repowering means switching a load to a new truck after it has already been dispatched. If an issue occurs and a switch of trucks or drivers is needed before a load is dispatched, it is known as reassigning. (Doc. 121, Ex. 15, Wade Depo. at 31:5-32:13).
[7] There is a limit on the maximum number of hours a trucker my drive set by the Department of Transportation for safety reasons. 49 C.F.R. §§ 395.1-395.15 (2014).

Werner and Staples. *Id.* at 57:19-60:11. Through his management, on-time safe deliveries improved at the London, Ohio Staples location from 90% to 99.6%. *Id.* at 62:3-63:12, 69:6-70:7, 74:2-76:11, 123:19-124:13.

Mathew Brewer is an opt-in plaintiff who no longer works for Werner. (Doc. 121, Ex. 2, Brewer Depo. at 6:20-7:1; Doc. 82, Ex. 1, Consent Forms at 6). When he worked for Werner, however, he was a fleet coordinator at the Staples-dedicated facility in London, Ohio – meaning he was essentially a fleet manager who worked the night shift. *Id.* at 14:16-15:7. He was a salaried employee, who was paid the same (approximately $3,000 per month) regardless of how many hours he worked. *Id.* at 16:6-18:3. During his time in London, he worked 4 p.m. to 4 a.m. Sunday-Thursday and worked three planning hours on Saturday – a total of 63 weekly hours. *Id.* at 18:17-19:18. When working, Brewer oversaw drivers, matching drivers with loads in order to make sure things were delivered on time. *Id.* at 21:6-22:15. At the Staples-dedicated site, he was the only Werner employee, overseeing drivers who were employed by Staples. *Id.* at 22:22-24:24. If a driver used up, while out on delivery, the maximum allowable DOT hours, or had some other mishap, he would work with load planners and dispatchers to see if another truck could take over the load. *Id.* at 23:11-25:20, 28:18-29:4. He did not have authority, he said, to punish a driver, but he could remove them from the schedule for safety issues (sickness) or having used their maximum number of DOT hours. *Id.* at 26:23-28:17. He would also help with making sure the drivers completed their required quarterly safety training. *Id.* at 29:5-29:24.

James Brown is an opt-in plaintiff in this litigation. (Doc. 90, Ex. 1 Consent Forms at 3). Brown has been, during his tenure at Werner, both a fleet manager and a fleet coordinator. (Doc. 121, Ex. 3, Brown Depo. at 9:14-9:22). He works at a Wal-Mart-dedicated facility in Tomah, Wisconsin. *Id.* at 10:6-10:14   He is a salaried employee, paid the same no matter how many

6

hours he works. *Id.* at 10:18-11:12 (Brown started at approximately $2,200 per month). He currently works a 7 a.m. to 7 p.m. rotating schedule with two or three days on followed by two days off. *Id.* at 12:21-13:14. In his current capacity as fleet manager, he manages a board of drivers, works with a load planner to assign loads to drivers, works out "back hauls" and "detention pay" and otherwise manages the drivers to make sure they deliver on time. *Id.* at 15:7-15:25. Part of this involves working out problems by managing drivers and communicating with load planners to, when necessary, repower loads to make sure everything gets delivered on time. *Id.* at 21:6-21:15. While he does not have discretion to unilaterally reassign routes based on driver complaints, he can work with load planners to address such issues. *Id.* at 29:24-30:9. He and a "safety guy" on site send out messages to drivers reminding them to complete quarterly training. *Id.* at 16:24-17:18. While he does not personally have the authority to hand out discipline, he does issue verbal warnings/write-ups and, for more serious discipline, he can pass recommendations on to his supervisor. Sometimes these are followed, and sometimes not. *Id.* at 19:13-21:5. Being at a dedicated center, Brown also works as a liaison to the customer (in this case Wal-Mart) and uses discretion to address any concerns or problems they might have. *Id.* at 22:7-23:17. He sometimes has suggested new ideas to higher-level management and, on at least one occasion, his ideas were implemented. *Id.* at 42:9-44:5.

John Cannon is an opt-in plaintiff in this lawsuit. (Doc. 90, Ex. 1, Consent Forms. at 4). He was a dedicated manager at Werner but, in 2010, voluntarily stepped down to fleet manager. (Doc. 121, Ex. 4, Cannon Depo. at 6:1-6:7). Before becoming a dedicated manager he had been a night fleet coordinator (night version of fleet manager) and, in that capacity, he worked 6 p.m. to 4 a.m. and on Friday, 6 p.m. to 6 a.m. *Id.* at 33:20-34:7. In his present capacity, as a salaried fleet manager at the dedicated Anheuser-Busch Columbus office, he works 5 a.m. to 3 p.m.

weekdays and every fifth Saturday from 4 a.m. to 10 a.m. *Id.* at 34:20-35:22. For this, he is paid a base salary of approximately $3,000 per month. *Id.* at 34:20-35:2. His schedule has varied a great deal over the years, but he always worked a minimum of 50 hours per week. *Id.* at 35:23-39:22. He summarized his duties as a fleet manager as being a liaison between drivers and departments that can solve whatever issues the driver is having. *Id.* at 40:19-40:23. He communicates with drivers about DOT hours and works with planners and other personnel to, if necessary, repower loads in the event of delays or other incidents. *Id.* at 41:15-43:14, 44:14-44:23. He helps to deal with breakdown issues by communicating with Werner's breakdown department. *Id.* at 43:15-44:6. He has some limited communication with the customer. *Id.* at 44:24-45:9. He communicates with drivers regarding quarterly safety training. *Id.* at 45:17-46:4. While he does not, himself, mete out disciplinary consequences, he does verbally discuss problems with drivers, issues written warnings, and sometimes initiates disciplinary meetings with higher management. *Id.* at 46:13-48:1. He also communicates any changes in corporate policy to the drivers under his management. *Id.* at 55:22-56:10. Cannon, because of his large number of years with Werner, has an informal role in recruiting and training. *Id.* at 65:4-70:11. For similar reason, and because of his experience as a truck driver,[8] he ends up taking something of a leadership role in the office. *Id.* at 85:22-90:4.

Joseph Casper is an opt-in plaintiff in this litigation. (Doc. 82, Ex. 1, Consent Forms at 9). He was employed at the headquarters Omaha office of Werner as a dedicated night fleet coordinator. (Doc. 121, Ex. 5, Casper Depo. at 6:19-7:8). He, as a dedicated account employee, worked almost exclusively on the Family Dollar account but also put in about 10% of his time (mostly weekends) on the Sears and Home Depot accounts. *Id.* at 9:23-10:15. His schedule was

---

[8] He, in fact, is one of only two people in the Anheuser-Busch Columbus office who has ever driven a big truck. (Doc. 121, Ex. 4, Cannon Depo. at 89:21-90:4).

seven days on then seven days off, 7 p.m. to 7 a.m. *Id.* at 10:16-11:4. But no matter how many hours per week he worked, he was always paid the same salary – approximately $2,300 per month which, when bonuses are added-in, came to around $39,000 per year. *Id.* at 12:5-14:6. He took breaks during the day, but did not (and was not required to) report his time. *Id.* at 14:11-15:5. Casper tracked the timing of loads for Family Dollar and dealt with accidents or other driver issues. *Id.* at 26:6-27:7. He did not track DOT hours. *Id.* at 45:17-45:21. He took and appropriately submitted, but was not responsible for processing, time off requests. *Id.* at 27:8-27:21. Casper testified that he, more than most of the other employees deposed, would note problems and pass the buck rather than solving them himself. *See, e.g., Id.* at 32:14-35:11. Casper did, however, admit to having exercised some discretion and problem-solving intelligence about whom to contact based on information given to him by the drivers when the drivers encountered issues. *Id.* at 39:15-39:22.

Robert Cook is an opt-in plaintiff in this matter. (Doc. 82, Ex. 1, Consent Forms at 12). He was a night fleet coordinator at Werner's headquarters in Omaha. (Doc. 121, Ex. 6, Cook Depo. at 6:19-7:11). He, like the others, worked in an office environment and described it as a "row of cubicles." *Id.* at 7:12-7:20. His hours were 6 p.m. to 6 a.m. in a repeating schedule: Monday-Tuesday on, Wednesday-Thursday off, Friday-Sunday on, Monday-Tuesday off, Wednesday-Thursday on, and Friday-Sunday off. *Id.* at 8:12-9:3. He was paid approximately $2,500 per month as a salaried employee and was paid the same regardless of how many hours he worked. *Id.* at 10:2-10:22. While working as a night fleet coordinator, he managed boards of trucks, matched up trucks with loads, and made sure loads were "first in, first out." *Id.* at 21:13-22:5. Essentially, he just picked up where the day fleet manager left off. *Id.* at 22:6-23:9. He had some face-to-face contact with drivers and would pass messages to them about, for instance,

9

quarterly safety training. *Id.* at 23:10-24:1.  He would give guidance about load/weight distribution within a truck if asked and had the ability to approve lumper[9] pay up to a certain preset maximum. *Id.* at 39:1-41:8.  He also had to assign loads sometimes if they were not already assigned during the day or if unexpected events, such as an overweight load, a load not ready to ship, or a broken truck, forced such a change. *Id.* at 24:2-25:12.  He double-checked driver safety inspections insofar as he saw the driver logs wherein the drivers recorded having done the safety checks. *Id.* at 28:2-28:10.  The system was fairly automated, however, and he kept track of safety checks and DOT hours essentially by relying on Werner's automated system. *Id.* at 26:18-28:16.  But, in spite of the automation and organization, sometimes "things would fall apart" and he would have to "improvise" and get trucks from other regions and develop solutions to delivery problems on his own. *Id.* at 31:2-33:25.  Moreover, Werner's shipping system, a bi-directional truck relay of sorts, required some improvisation and load switching in order to make sure the pipeline moved smoothly. *Id.* at 34:1-35:7.  Cook had some limited contact with customer representatives. *Id.* at 35:8-36:3.  He did not discipline drivers but could and, apparently did, pass on such information to the fleet manager to deal with during the day. *Id.* at 29:2-29:9.

Stephen Dean is an opt-in plaintiff in this litigation. (Doc. 83, Ex. 1, Consent Forms at 4). Dean was a fleet manager for some of his time at Werner at the dedicated Anheuser-Busch location in Columbus, Ohio. (Doc. 121, Ex. 7, Dean Depo. at 5:5-5:8). Dean received a salary of around $3,000 per month that was the same regardless of how many hours he worked. *Id.* at 11:13-12:5; *see also id* at 8:5-8:10 (this, presumably with bonuses added in, approximated

---

[9] A lumper is the person who loads or unloads a truck.  This person is sometimes the truck driver, an employee of the customer, or an independent laborer.  Thus, lumper pay is money that goes to that person as payment for loading/unloading.  *See, e.g., Owner-Operator Indep. Drivers Ass'n v. Supervalu, Inc.,* 651 F.3d 857, 859 (8th Cir. 2011) (discussing lumpers).

$40,000 per year). He always worked at least 50 hours per week and sometimes more. *Id.* at 13:17-15:21. When on the job as a fleet manager, he kept up with absenteeism and passed that information along to the dedicated manager. *Id.* at 19:11-19:17. He acted as a liaison between the drivers and upper management and other resources. *Id.* at 19:24-20:3. Specific tasks included investigating instances where loads were delayed, relaying driver concerns about payroll issues, and working with the load planner and dedicated manager to give drivers requested time off. *Id.* at 20:4-22:11. He acted as a contact between the drivers and the load planner to solve issues related to DOT hours. *Id.* at 24:11-25:23. If drivers judged it unsafe to continue to drive, he would relay that message to the load planner or dedicated manager so it could be passed on to the customer; direct contact with the customer was rare and mostly happened in the mornings when he was the only one in the office. *Id.* at 25:24-27:11. Dean did send out the occasional safety bulletin and remind drivers about their quarterly safety training (working with the load planner to make sure that the drivers had the hours in which to complete the training) but there was a safety supervisor on site whose job encompassed most of the safety-oriented tasks. *Id.* at 28:14-31:15. He was not responsible or empowered to discipline drivers, but he could and did speak to them about issues (especially tardiness) and would follow-up with the dedicated manager. *Id.* at 33:1-34:8.

Neil Kitchen is an opt-in plaintiff in this case. (Doc. 90, Ex. 1, Consent Forms at 20). In 2005 Kitchen began work at Werner's Omaha headquarters as a fleet coordinator in Werner's vans division. (Doc. 121, Ex. 11, Kitchen Depo. at 9:3-9:23). However, after a short time he made a lateral move to work on a dedicated Staples account in Georgia as a fleet coordinator. *Id.* at 9:24-11:12. While there he worked 10 to 11 hours per day, five days per week and was paid a base salary of about $ 2,100 per month for doing so. *Id.* at 27:22-30:1. Kitchen, like the other

deponents, explained that his job was to manage drivers. Specifically, he implemented shipping plans, kept track of DOT hours, communicated with drivers, arranged repowers when necessary, redistributed loads, and dealt with other driver issues like absenteeism. *Id.* at 11:23-16:5. However, during his deposition, Kitchen went out of his way to attempt to emphasize, frequently in conflict with his prior statements about the scope of his job, that he was merely a conduit between drivers and higher management and that he made few to no independent decisions at all. *E.g.*, *id.* at 11:23-16:5, 65:17-68:3. In fact, he testified that his prior affidavit (which was frequently contradicted by his deposition testimony and signed before he opted into this lawsuit) was partially untrue and was something he was forced to sign. *Id.* at 17:23-20:8, 22:11-22:17. In time, Kitchen became a fleet manager for Best Buy. *Id.* at 49:9-49:17. Again, he worked 10 to 11, and even 12 hours per day, five to six days per week. *Id.* at 70:7-71:11. Despite his alleged lack of managerial function, he stated that as a fleet manager he took a more active role in management and described his management and decision-making style. *Id.* at 50:8-51:15. He never, however, played any role in disciplining and counseling drivers other than compiling reports on how long trucks remained idle, how many miles per gallon drivers got, and whether they went out of their route. *Id.* at 56:9-58:15. These reports, he said, were something he did in his own discretionary initiative, not something he was required to do. *Id.* at 64:3-64:11. In his final period at Werner, Kitchen worked on a Wal-Mart account in Indiana. *Id.* at 79:12-79:20. His schedule during that period was seven days on followed by seven days off with approximately the same hours and duties as his prior work. *Id.* at 80:6-80:16.

Joseph Ogier is an opt-in plaintiff in this litigation. (Doc. 90, Ex. 1, Consent Forms at 27). Ogier was a fleet manager at Werner in their Phoenix office. (Doc. 121, Ex. 12, Ogier Depo. at 7:24-8:1, 25:23-26:1). He received, like all the other deponents, a salary and occasional

bonuses. His salary – about $3,000 per month – stayed the same no matter how many hours he worked. *Id.* at 10:1-18:20. His hours fluctuated, but 6 a.m. or 7 a.m. to 4 p.m. or 5 p.m., was typical. *Id.* at 19:1-21:22. His job, he said, was to manage a fleet of 65-70 trucks and act as a point of contact for the drivers to help them resolve problems they may have during the day. *Id.* at 27:2-27:11. In this capacity he worked with load planners and fleet supervisors to make sure loads were delivered on time, repowering or reassigning as necessary. *Id.* at 27:21-29:7. He also worked with customers, either directly or through the marketing department, to arrange (and rearrange in the event of delays) pick-up and delivery times. *Id.* at 29:17-33:3. Ogier emphasized the necessity of communicating with his supervisor, but admitted that he (though not every time) played a role in decisions. *Id.* at 33:4-33:14. He explained that he helped to guide new drivers by answering their questions. *Id.* at 43:12-45:3. He also monitored DOT hours in order to make sure no fatigued (and therefore, unsafe) drivers were on the road. *Id.* at 45:16-47:3. Indeed, he specifically said that he was able to order drivers who had exceeded their DOT hours to stop driving. *Id.* at 49:18-49:22. Though stating that he played no role in terminating a driver, Ogier acknowledged that he played a role in discipline by writing up drivers and counseling them. *Id.* at 40:1-40:20. He acknowledged, moreover, that enough write-ups by him about a driver could result in termination of the driver and that, in at least one case, a driver was indeed terminated based on Ogier's write-ups. *Id.* at 40:21-41:15. He acknowledged that he had the ability to approve vacations and home time off requests by drivers but noted that his was not the final say and the supervisor could reverse his approval. *Id.* at 47:4-48:11.

Troy Sohn is an opt-in plaintiff in this case and a former employee of Werner. (Doc. 82, Ex. 1, Consent Forms at 45; Doc. 121, Ex. 14, Sohn Depo. at 7:19-7:21). Sohn worked a 12 hour shift, seven days on – seven days off, and was paid the same biweekly salary regardless of the

13

hours worked. (Doc. 121, Ex. 14, Sohn Depo. at 8:25-11:12) (he was paid approximately $2,500 per month as a salary with monthly bonuses of around $750). Though the Court has endeavored to summarize the job duties and circumstances of each witness in an effort to elucidate the record on which the pending motions will be decided, Sohn, by his own admission, remembers little about his brief stint with Werner. *See, e.g., Id.* at 15:6-15:8, 17:16-18:3. He is not even sure, for instance, if he was hired as a night fleet coordinator or a customer service manager. *Id.* at 8:8-8:13. Thus, his testimony is of little use.

## B. Defendant's Witnesses

### 1. Potential Plaintiffs and Low-Level Management

Michael Andresen is a director of operations for Werner. (Doc. 121, Ex. 1, Andresen Depo. at 7:1-7:3). In his long tenure with Werner, he has held many titles, including fleet manager. *Id.* at 7:6-8:18. He confirmed the organizational structure of positions at Werner. The line employees are the truck-drivers and other on-the-ground personnel. *Id.* at 8:19-9:8. Then come the fleet managers who oversee the truckers. *Id.* Then are the fleet supervisors who oversee the fleet managers. *Id.* The difference, he said, between a fleet manager and a fleet coordinator is that fleet managers work during the day and fleet coordinators work at night. *Id.* at 29:19-29:24. Andresen testified that when he was a fleet manager, he ran a board of 50-60 drivers and was responsible for managing them on a day-to-day basis – solving issues of timing, productivity, and safety. *Id.* at 12:10-12:24. He had authority to make hiring recommendations – but not final decisions. *Id.* at 13:14-13:17. He was involved in training drivers, and working with load planners to schedule deliveries. *Id.* at 13:20-15:10. A fleet manager also, he said, has the power to write up drivers and recommend terminations – though not, he implied, the power to actually impose discipline. *Id.* at 28:17-29:18.

14

Alan Gaston is currently a dedicated road breakdown agent but was, until 2012 a dedicated manager and Wade's supervisor. (Doc. 121, Ex. 9, Gaston Depo. at 5:2-5:19). He was based in Omaha but oversaw dedicated sites for Staples on behalf of Werner in Texas, Kansas, and Ohio. *Id.* at 8:10-8:20. The only fleet coordinator he supervised was Wade; the remaining locations did not have an intermediary between Gaston and the drivers whom Gaston managed directly. *Id.* at 9:17-10:11. Wade would contact Gaston from time to time during his shift "[i]f he couldn't find somebody to provide a tractor for him to cover a load that was in jeopardy and he had exhausted all of his resources then he would call me to notify me so I could reach out to my resources." *Id.* at 14:10-14:21, 20:9-21:8. In other words, according to Gaston, Wade solved driver issues on his own and did not disturb Gaston unless his own resources proved unequal to the task. *Id.* Wade, moreover, scheduled drivers and assigned loads for the Ohio Staples facility. *Id.* at 16:18-16:21. Wade did driver interviews and the decision about whether or not to hire was mutual between Wade and Gaston. *Id.* at 18:3-19:5. Anyone managing drivers, Gaston said, would be responsible for making sure they did their quarterly safety training and Wade, in particular, could pull them from the schedule for failing to do so. *Id.* at 25:6-25:21. Gaston explained that Wade could discipline drivers by shutting them down for the night and pulling their loads. *Id.* at 19:14-19:21. Wade could also give drivers vacation time if they asked for it because he made the schedules for the Ohio office. *Id.* at 24:21-25:5. In fact, apart from firing, which Gaston agreed that Wade did not have the power to do, Gaston could not think of anything which Wade would have to ask for approval to do. *Id.* at 19:6-19:13. It was expected that Wade would be at work from 6 p.m. to 4 a.m. but it was not a set schedule and Gaston did not track his

hours. *Id.* at 22:2-22:13. Ray Baker[10] and Mathew Brewer, Gaston said, replaced Wade after he left Werner and did essentially the same job. *Id.* at 26:9-27:22.

Michael Johnson was a fleet manager for approximately twelve years before changing to the night shift and becoming a fleet coordinator at the Omaha global headquarters of Werner. (Doc. 121, Ex. 10, Johnson Depo. at 8:21-9:14). Johnson did not opt-in to the class and is not a plaintiff. As a fleet manager he worked 10-hour shifts. As a fleet coordinator he worked 12-hour shifts. *Id.* at 12:19-12:23. He has, just in the two months prior to the deposition, switched to a daytime fleet manager position again but with 12 hour shifts in a seven on seven off rotation. *Id.* at 24:14-27:5. However, there is very little difference between the positions (fleet manager vs. fleet coordinator) and what little difference there is, in his opinion, inheres in the fact that some administrative duties do not arise at night. *Id.* at 26:20-28:1. In regards to what he does at work, Johnson testified that he is the primary contact for drivers and he works with the drivers and load planners to ensure safe and on-time delivery. *Id.* at 14:10-15:11. He also, he said, deals with safety issues that drivers might have, including managing their hours, if they are sick or unfit to drive, if they break down, or if they run into foul weather. He deals with these situations by, among other things, answering driver's questions, arranging repowers for their loads, instructing drivers to take rest breaks and then resume, or working with the en-route maintenance department to arrange repairs. *Id.* at 15:12-18:13, 20:5-20:22. He also handles questions about HazMat compliance and securing loads by either ascertaining the answer himself or referring the question to the safety department. *Id.* at 18:14-19:11. He answers questions about pay and, within a reasonable limitation, has discretion to authorize additional payments to drivers who are assigned unproductive loads, who break down, or who, through no fault of their own, have a bad

---

[10] Rayshawn Baker is a plaintiff but has not been deposed and thus is not a subject of this Order.

16

week. *Id.* at 20:23-22:18. As a day fleet manager he might be more prone to engage in driver discipline such as counseling, but as a night coordinator he usually left that for the day manager. *Id.* at 28:6-28:19. However, he does follow up with drivers to make sure they conduct their quarterly safety training and, in an extreme case, he will shut drivers down until they have completed it. *Id.* at 38:19-39:15. There is very little for which he has to seek supervisor approval and though he does not have unilateral authority to hire or fire drivers, he does play a role in making recommendations in that regard. *Id.* at 40:9-41:8. He has never been required to track his hours. *Id.* at 29:16-29:22. He is paid on a salary basis and gets bonuses based on production (miles driven by the drivers he manages), driver retention, and driver safety. *Id.* at 34:12-34:21.

## 2. High-Level Management

Chad Dittberner is a vice president of dedicated operations and was the supervisor in charge of the management team that supervises Wade. (Doc. 121, Ex. 8, Dittberner Depo. at 8:12-8:13, 9:7-9:10). Dittberner has never personally held the position of fleet manager or fleet coordinator nor has he ever directly supervised these positions. *Id.* at 10:10-10:15. However, he agreed that fleet coordinators manage drivers, respond to drivers' needs, and work out how to fix problems like breakdowns and late loads in compliance with DOT hours requirements. *Id.* at 30:6-32:3. He admitted that they lack authority to hire or fire, but testified that they have significant advisory input in such decisions. *Id.* at 32:4-33:14. Fleet managers, he confirmed, have very similar duties to fleet coordinators (except they work the day shift). *Id.* at 35:7-35:22. Though insisting that all persons at Werner play a role in training and, therefore, safety, Dittberner testified that neither fleet coordinators nor fleet managers are part of the safety department at Werner Enterprises. *Id.* at 37:6-41:5. Dittberner also acknowledged that the written job description of "fleet manager" indicated it was a position without supervisory responsibilities but qualified this saying that he understood it to mean no supervisory

17

responsibilities within the office environment. *Id.* at 53:2-53:10. Fleet coordinators/managers, he said, do have such responsibilities with respect to the drivers in the shift that they are working. *Id.* at 45:9:45-19.

Guy Welton is vice president of operations for Werner's van network. (Doc. 121, Ex. 16, Welton Depo. at 8:2-8:5). He oversees the side of Werner's business that hauls a variety of different customers' loads as opposed to the dedicated side of Werner's business, where Werner employees deal with freight only for one large customer. *Id.* at 8:17-8:21. Welton testified that, in relatively recent years, the fleet manager role has changed to put more of an emphasis on safety. Managers are to make sure that their drivers are running within the legal hours limits as well as taking account of fatigue, weather conditions, and the like. In addition, they are required to make sure their drivers undergo quarterly safety training. *Id.* at 14:23-17:2. Welton also described how Werner's electronic system will notify fleet managers when events such as hard-braking or roll-over stability are triggered and that it is then the responsibility of fleet managers to get in touch with the driver and use their discretion to counsel, order a rest break, notify the safety department, or take other action. *Id.* at 17:3-20:10. Fleet managers, however, Welton admitted, are not part of the safety department. *Id.* at 20:18-20:20. Fleet managers cannot, he admitted, hire or fire. *Id.* at 22:2-22:7. But, he testified that they can discipline their drivers without the need for supervisor approval by coaching, counseling, write ups, or removing a load from a driver. They can also suggest suspension or termination to a superior. *Id.* at 22:21-24:10. Fleet managers make the schedules for drivers. *Id.* at 24:19-24:21. Fleet managers also train drivers on topics relating to orientation to Werner. *Id.* at 27:7-27:20.

Christopher Polenz is the associate vice president of human resources for Werner. (Doc. 121, Ex. 13, Polenz Depo. at 8:11-8:14). Polenz began as a management trainee then moved to

fleet coordinator, then fleet manager, and then up through the ranks to his current position. *Id.* at 8:18-9:9. According to Polenz, fleet managers and fleet coordinators are responsible for managing the production, retention, on-time service, and safety of their board of drivers. *Id.* at 16:14-16:24. There is, Polenz said, a base pay for fleet managers and coordinators and then they are given bonuses based on production, retention, on-time service, and safety of the drivers they manage. *Id.* at 17:17-17:22. Fleet manager and fleet coordinator hours are not tracked by Werner based on Werner's conclusion that those positions are exempt. *Id.* at 25:19-26:5. Human Resources, in conjunction with the legal department, is the group that generally makes exemption decisions for Werner. *Id.* at 31:6-31:15. Polenz confirmed that fleet managers and coordinators cannot hire or fire, but said they have input into such decisions. *Id.* at 37:2-37:19. Polenz explained that though fleet managers and coordinators lack a supervisory title, they are acting supervisors during their shifts and their essential job functions amount to supervising drivers. *Id.* at 41:3-42:21.

## III.   DISCUSSION

### A. Motion to Strike

Plaintiffs move to strike four affidavits attached as exhibits EE-HH to Werner's memorandum in support of summary judgment (Doc. 124) and memorandum in support of Werner's motion to decertify (Doc. 126). (Doc. 135, P. Mot. to Strike). In Plaintiffs' motion and reply, Plaintiffs argue that deposition testimony by Mathew Brewer and Neil Kitchen shows that all four of these affidavits were signed under coercive circumstances. (Docs. 135, 142, *in passim*). In response, Werner asserts that it did nothing coercive, that Plaintiffs are fabricating their accusations, and that, even if there were some inherent coercion in an employer obtaining an affidavit from an employee, such circumstances affect the weight a fact-finder may give the affidavit but do not justify striking it. (Doc. 140, D. Re. in Opp. to Mot. to Strike *in passim*).

While Federal Rule of Civil Procedure 12(f) allows a Court to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," it does not address whether a Court may strike evidence. Fed. R. Civ. P. 12(f) (emphasis added); *see also, e.g., Adams v. Valega's Prof'l Home Cleaning, Inc.*, No.: 1:12-cv-644, 2012 U.S. Dist. LEXIS 157550, *4-6 (N.D. Ohio Nov. 12, 2012) (a motion to strike applies only to pleadings and is thus not technically applicable to motions for summary judgment or evidence attached thereto). The authority to strike or disregard evidence principally derives, in the summary judgment context, from Rule 56(c)(2) which allows a court to, upon objection by a party, refuse to consider material cited that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *see also* Fed. R. Civ. P. 56 2010 committee note (explaining, with respect to subpart (c)(2), that such objection "functions much as an objection at trial, adjusted for the pretrial setting").

Considered in this light, it is apparent that the affidavits should not be stricken. Their failing, according to Plaintiffs, is not one of admissibility as comprehended by the Rules of Evidence; rather that they were coercively obtained and contain falsehoods. (Docs. 135, 142, *in passim*). A court, sitting in a trial, would not exclude testimony based on such allegations; rather the jury would hear the testimony and weigh its credibility in light of the allegations of falsehood and coercion. This Court, confronting a pretrial analog to that situation, shall observe an analogous rule: The affidavits shall not be stricken but, when considering the facts in the light favorable to the Plaintiffs (as this Court is bound to do when considering summary judgment against the Plaintiffs) the Court shall (based on Plaintiffs' allegations) accord the affidavits no evidentiary weight. Conversely, when considering whether Plaintiffs are entitled to summary

judgment and construing all reasonable factual inferences in favor of Werner, the Court shall (in light of the position taken by Werner – that no coercion was present) consider the affidavits.

The Court recognizes the lengthy line of Sixth Circuit precedent holding that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006) (quoting *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997)) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). The Court also recognizes that this rule has sometimes been used to strike or partially strike affidavits as an exercise of the inherent power of the courts to refuse to entertain fraudulent or frivolous arguments. *See, e.g.*, *Aerel S.R.L.*, 448 F.3d at 906-907. However, this inherent power is not a broad method of exclusion by which a Court can strike evidence it considers untrustworthy, but instead merely "reflect[s] the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact." *Id.* at 908. This Court concludes that the appropriate procedure in this case, is to leave the evidence in the record (where it may legitimately be referenced should this decision be appealed) but accord it no weight when considering summary judgment against the parties (in this case Plaintiffs) who allege that it was improperly or coercively obtained.

## B. Summary Judgment

Both Werner and Plaintiffs have moved for summary judgment in this case. (Docs. 122, 123). Plaintiffs argue that they are non-exempt employees under the Fair Labor Standards Act (FLSA) and the Ohio Minimum Fair Wage Standards Act (OMFWSA) and, as such, were entitled to overtime pay. (Doc. 122, P. Mot. for SMJ at 5-15). Werner argues that they were exempt and, as such, not entitled to such pay. (Doc. 124, D. Memo. in Supp. of SMJ at 35-50).

### 1. Standard

"The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009) (citing *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence

22

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

## 2. Federal Law Controls the Applicability of the Exemptions Alleged for All Claims

Though Wade brings claims under both the FLSA and the OMFWSA, the exemptions applicable to this case are the same for both. That is, the OMFWSA is to be interpreted "subject to the exemptions of section 7 and section 13 of the 'Fair Labor Standards Act of 1938,' 52 Stat. 1060, 29 U.S.C.A. 207, 213, as amended." Ohio Rev. Code § 4111.03(A). Thus, the questions in this case, which center around whether Wade and his fellow Plaintiffs are exempt from the reach of the FLSA and OMFWSA, will be answered using the same law – federal.

## 3. The FLSA and Potential Exemptions

The FLSA was enacted in 1938 (and significantly amended several times thereafter) to address "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . ." 29 U.S.C. § 202 (2012). In pursuit of this goal, the FLSA penalized employers who scheduled employees for long hours (and concomitantly rewarded the employees who worked them) by requiring "time and a half" pay for overtime hours. 29 U.S.C. § 207. However, presumably recognizing that some jobs do not need such protection and can be performed for long hours without dipping below "the minimum standard of living necessary for health, efficiency, and general well-being of workers," Congress carved out a number of exceptions to this requirement. 29 U.S.C. §§ 202, 213 (2012).

The first exemptions potentially relevant to this case are found in 29 U.S.C. § 213(a)(1). Section 213 provides that the overtime pay requirements of 29 U.S.C. § 207 "shall not apply with respect to—(1) any employee employed in a bona fide executive[] [or] administrative . . . capacity . . . ." 29 U.S.C. § 213(a)(1). "The FLSA grants the Secretary [of Labor] broad

23

authority to 'define and delimit' the scope of the exemption for executive, administrative, and professional employees." *Auer v. Robbins*, 519 U.S. 452, 456 (1996) (citing 29 U.S.C. § 213(a)(1)). Moreover, "[b]ecause Congress has not 'directly spoken to the precise question at issue,' [a court] must sustain the Secretary's approach so long as it is 'based on a permissible construction of the statute.'" *Id.* (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984)). Thus, in interpreting these exemptions, this Court shall follow the United States Code of Federal Regulations. *See, e.g., Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir. 2013).

Section 213 also exempts employees who are subject to the hours provisions of the Motor Carrier Act. 29 U.S.C. § 213(b)(1). Unlike the executive and administrative exemptions, the Motor Carrier Act exemption is not interpreted by the regulations promulgated by the Secretary of Labor; rather it "is to be interpreted in the light of the regulations made by the Interstate Commerce Commission . . . ." *Levinson v. Spector Motor Service*, 330 U.S. 649, 677 (1947). However, the relevant regulations set forth by both the Secretary of Labor and the Interstate Commerce Commission are codified in the Code of Federal Regulations. Thus, here again, the appropriate source of law is the Code of Federal Regulations.

Werner "bears the burden of proving that [each alleged] exemption applies to [each] employee in question." *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997) (citing *Mich. Ass'n of Gov't Emps. v. Mich. Dep't of Corrs.*, 992 F.2d 82, 83 (6th Cir. 1993)). Plaintiffs argue that this imposes a "stringent burden" upon Werner of proof by "clear and affirmative evidence." (Doc. 138, P. Re. in Opp. to SMJ at 6). Although there is some law in the Sixth Circuit purporting to support that proposition, the Sixth Circuit has "now made it clear that the employer claiming an FLSA exemption does not bear any heightened evidentiary burden," and

24

"'because establishing the applicability of an FLSA exemption is an affirmative defense, [the defendant] has the burden to establish the . . . elements by a preponderance of the evidence.'" *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501-02 (6th Cir. 2007) (quoting *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007)).

### a. The Administrative Exemption

With respect to the administrative exemption to the FLSA, the Code of Federal Regulations provides as follows:

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $ 455 per week . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1-3) (2014).

In this case, Plaintiffs have admitted that they were paid in excess of $455 per week. (Doc. 122, P. Mot. for SMJ at 6 n.3). Moreover, there is unanimity amongst deponents that they were salaried – having a base pay that did not vary based on the quality or quantity of work performed. *See supra* pp. 4-13; 29 C.F.R. § 541.602(a) (2014). Thus, at issue here is whether the Plaintiffs also meet the requirements of parts (a)(2) and (a)(3) of 29 C.F.R. § 541.200.

With respect to (a)(2) and (a)(3), cases have split on whether dispatchers satisfy the requirements and hence, have split on whether they should be exempt. Cases that have doubted the exemption of dispatchers have done so for a variety of reasons in a variety of circumstances. *See Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1005-06 (N.D. Cal. 2010) (denying summary judgment because of a conflict in the evidence over whether truck dispatchers made

25

decisions or higher level managers made decisions); *Iaria v. Metro Fuel Oil Corp.*, No.: 1:07-cv-4853, 2009 U.S. Dist. LEXIS 6844, *6-21 (E.D.N.Y. Jan. 30, 2009) (denying summary judgment against the plaintiff, a truck dispatcher, in part based on a now-deleted portion[11] of the Field Operations Handbook for Wage and Hour Division investigators that had opined that dispatcher's duties of routing trucks and assigning drivers are dependent upon knowledge and do not ordinarily involve discretion and independent judgment at a level contemplated by the exemption); *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1309-14 (S.D. Fla. 2008) (denying summary judgment against dispatcher where dispatcher dispatched taxis, monitored airport traffic, weather, and flights, interacted with customers, and did various menial tasks around the office like cleaning desks and washing cars); *Marshall v. Nat'l Freight, Inc.*, No.: 76-0385, 1979 U.S. Dist. LEXIS 9989, *10-23 (D.N.J. Sept. 6, 1979) (concluding, after trial to the court, that dispatchers were not exempt because they did not exercise enough discretion – they could not discipline truck drivers, essentially referred all problems to a higher authority or different department, and required only 12 hours of training to learn how to do their jobs); *Goldberg v. Strickland Transp. Co.*, 203 F. Supp. 417, 420-21 (E.D. Ark. 1962) (finding that dispatchers are not exempt and distinguishing its holding from cases where dispatchers held managerial powers); *Sawyer v. Bay State Motor Express Co.*, 89 F. Supp. 843, 844 (D. Mass. 1948) (finding that a dispatcher who was no more than a dispatcher with "no charge over his fellow employees" was not an executive nor administrative assistant within the exempting clause of the FLSA).

---

[11] Chapter 22 of the current version of the handbook, perhaps recognizing the split of opinions, no longer includes a discussion of truck dispatchers' exemption status. U.S. Dep't of Labor, *Wage and Hour Division Field Operations Handbook*, ch. 22 http://www.dol.gov/whd/FOH/index.htm (last visited March 3, 2014).

On the opposite side of the issue, it is fair to generalize that cases that have found dispatchers to be exempt have done so where dispatcher's duties went beyond mere communication and tracking of vehicles. *See Puentes v. Siboney Contracting Co.*, No.: 9:11-cv-80964, 2012 U.S. Dist. LEXIS 150727, *in passim* (S.D. Fla. Oct. 19, 2012) (granting summary judgment to the defendant because the plaintiff, a truck dispatcher, exercised discretion in, among other things, assigning truck drivers to jobs, coordinating with customers, and deciding whether or not to use certain drivers, and was therefore exempt from the FLSA overtime requirements under the administrative exemption); *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004, 1015-16 (C.D. Cal. 2006) (finding that a dispatcher was an exempt administrative employee in part because he exercised discretion in planning assignments within DOT hours requirements and thus affected driver overtime pay); *Lapoint v. CRST Intern., Inc.*, 1:02-cv-180, 2004 U.S. Dist. LEXIS 26584, *27-30 (N.D. Iowa June 16, 2004) (concluding that a nighttime fleet manager/dispatcher was exempt where he "kept things running until the next day shift came in," i.e., was temporarily in charge); *D'Angelo v. J&F Steel Corp.*, No.: 01-cv-6642, 2003 U.S. Dist. LEXIS 6273, *4-5, *12-14 (N.D. Ill. Apr. 14, 2003) (concluding that a dispatcher/manager who coordinated steel deliveries was exempt though she could not hire or fire but could do write-ups); *Kennedy v. Cassens Transp. Co.*, No.: 95-cv-75456, 1997 U.S. Dist. LEXIS 14490, *8-15, *18-19 (E.D. Mich. Aug. 22, 1997) (concluding that a trucking company's dispatch supervisors and dock supervisors fall within both the executive and administrative exemptions and granting summary judgment to the defendant); *Donovan v. Flowers Marine, Inc.*, 545 F. Supp. 991, 993-94 (E.D. La. 1982) (concluding that barge dispatchers were exempt and remarking that most cases considering whether dispatchers are exempt conclude that they are); *Mooney v. Preston Trucking Co.*, 215 F. Supp. 568, 569-72 (D.N.J. 1963) (plaintiff-dispatcher was exempt where he

had disciplinary authority over truckers that he dispatched); *Harrison v. Preston Trucking Co.,* 201 F. Supp. 654, 656-57 (D. Md. 1962) (concluding that dispatcher was exempt where dispatcher was, at times, solely in charge and remarking that dispatchers seem to be generally exempt under administrative exemption); *Goldberg v. Ark. Best Freight Sys.,* 206 F. Supp. 828, 833-35 (W.D. Ark. 1962) (finding that dispatchers with authority to recommend hiring and firing and who make decisions to maximize driver profit are exempt); *Mitchell v. Branch Motor Express Co.,* 168 F. Supp. 72, 74-79 (E.D. Pa. 1958) (finding dispatchers were properly exempt where they arrange matters of route-planning, compliance with state weight limitations, maintenance, and where they have some disciplinary authority to, for example, recommend discharge); *McComb v. N.Y. & New Brunswick Auto Exp. Co.,* 95 F. Supp. 636, 640-42 (D.N.J. 1950) (concluding that dispatchers were exempt where they ran the office by themselves in shifts).[12]

As should be apparent from this lengthy listing of cases on both sides, there is no one factor that makes a dispatcher exempt or non-exempt under 29 C.F.R. § 541.200(a)(2) and (a)(3). It is nonetheless generally correct to say that dispatchers whose activities do not go beyond the paradigmatic dispatch duties of communicating and tracking vehicles are not usually exempt while those whose jobs encompass other responsibilities often are exempt. With this legal backdrop in mind, the Court turns to the final two prongs, (a)(2) and (a)(3), of 29 C.F.R. § 541.200. For the sake of better organization the Court shall address these in reverse order.

---

[12] The Sixth Circuit appears to have addressed the applicability of the administrative exemption to dispatchers only once and concluded that the dispatchers in question were not exempt because they were not paid on a salary basis, thus failing requirement (a)(1) of 29 C.F.R. § 541.200. *Walling v. Morris,* 155 F.2d 832, 836 (6th Cir. 1946).

### i.    (a)(3) – Primary Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

A primary duty of an employee is decided based on the character of the employee's job as a whole. 29 C.F.R. § 541.700(a) (2014). If an employee spends more than half his time doing a particular thing, he can generally show that to be his primary duty. 29 C.F.R. § 541.700(b). However, notwithstanding that principle, a worker who has a most important duty or a duty that could be said to be his principal, main, or major duty may properly consider that his primary duty even though he spends less than half his time on it. 29 C.F.R. § 541.700(a, c). In this case it is apparent, from review of the depositions and other evidence in the record, that Plaintiffs' primary duty was overseeing truck drivers operating within their bailiwick during their shift. *See supra* pp. 4-13.

"The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a) (2014). A review of the Plaintiffs depositions shows that they oversaw, on any given night, a fleet of from 30 to over 400 truck drivers. (*See, e.g.*, Doc. 121, Ex. 5, Casper Depo. at 34:21; Doc. 121, Ex. 12, Ogier Depo. at 26:13-27:11; Doc. 121, Ex. 3, Brown Depo at 45:14-45:23). Moreover, Christopher Polenz testified (and his testimony is not contradicted by Plaintiffs' evidence) that it costs Werner approximately $5000 to recruit a driver, that a truck is worth approximately $100,000, and that loads vary in value from $250,000 to $500,000 and up. (Doc. 121, Ex. 13, Polenz Depo. at 34:18-36:3). If Plaintiffs exercised discretion and independent judgment in overseeing these trucks, loads, and drivers during their shifts, they did so with respect to matters of significance.

The next consideration is discretion.

Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: . . . whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work

29

that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business . . . .

29 C.F.R. § 541.202(b). True, "[t]he exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c). However, this implication is not an inescapable certainty; rather:

> employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action.

29 C.F.R. § 541.202(c). With these principles in mind, some of the depositions of Plaintiffs reveal factual disputes about the amount of real discretion exercised and it is upon this factor that some of Plaintiffs' claims are inappropriate for disposition on summary judgment.

MALCOLM WADE

Wade was the dedicated night fleet coordinator (off hours fleet manager) for Werner's Staples account in London, Ohio. (Doc. 121, Ex. 15, Wade Depo. at 18:19-19:3, 37:5-37:10). Although Wade testified at times that he "watched" rather than "supervised" drivers and made other remarks to suggest he had little discretion, the facts which he related show that such a characterization would be inaccurate. *Id.* at 52:9-54:9. While this Court must accept the view of the facts most favorable to Plaintiff and is therefore focusing on Plaintiff's own testimony, the Court it is not compelled to accept unreasonable or conclusory characterizations of the facts which are at odds with the facts themselves. *See, e.g., Liberty Lobby*, 477 U.S. at 255; *Crawford v. Metro. Gov't*, 555 U.S. 271, 274 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195,

n.2 (2004)); *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Matsushita*, 475 U.S. at 587).

Wade was the only fleet coordinator/manager at the London, Ohio site. (Doc. 121, Ex. 15, Wade Depo. at 37:5-37:8). As such, he did all the planning and scheduling for the entire London, Ohio, operation. *Id.* at 59:3-59:13. He admitted he had discretion in this regard though he said it was limited by the interpretation of an off-site boss and the needs of the customer. *Id.* at 59:3-59:22. He received a salary while at Werner and was paid additional bonuses based on operating efficiencies, safety, and timely delivery of his group of drivers. *Id.* at 19:4-20:7, 24:23-25:1, 34:10-34:12. To ensure on-time and safe deliveries Wade was empowered to deal with unexpected events. For example, in the event of a breakdown, Wade would work with his superior, Al Gaston, or an off-hours management team at Werner's headquarters in Omaha to reroute trucks or rearrange the loads to make sure the route was covered. *Id.* at 29:16-31:4. In the case of, for instance, a damaged trailer, he would deal with the issue by ordering that the load be switched with a replacement trailer and then arranging for service for the broken trailer. *Id.* at 38:3-40:18. As another example, if drivers did not have enough remaining DOT driving hours to complete a route he would schedule or reschedule them (possibly with a second driver) accordingly. *Id.* at 99:7-99:24. In the event that Wade could not manage to repower or reassign a load or otherwise deal any eventuality that occurred, he would call Staples and inform them of the late load. *Id.* at 32:21-33:8, 62:3-63:12. In addition, though Wade lacked the power to unilaterally fire drivers, he would discipline them through counseling and by forwarding recommendations regarding termination to his superior. *Id.* at 103:5-105:12. In short, he managed drivers, planned loads and scheduled drivers, worked with drivers on safety issues, and worked with the customer to maintain a good relationship between Werner and Staples. *Id.* at

57:19-60:11. Through his management, on-time safe deliveries improved at the London, Ohio Staples location from 90% to 99.6%. *Id.* at 62:3-63:12, 69:6-70:7, 74:2-76:11, 123:19-124:13.

As a matter of law then, Wade exercised discretion and independent judgment in supervising the truck drivers at the London, Ohio, facility.

JAMES BROWN

James Brown works at a Wal-Mart-dedicated facility in Tomah, Wisconsin. (Doc. 121, Ex. 3, Brown Depo. at 10:6-10:14). As a fleet manager, he manages a board of drivers, works with a load planner to assign loads to drivers, works out "back hauls" and "detention pay" and otherwise manages the drivers to make sure they deliver on time. *Id.* at 15:7-15:25. Part of this involves working out problems by managing drivers and communicating with load planners to, when necessary, repower loads to make sure everything gets delivered on time. *Id.* at 21:6-21:15. While he does not have discretion to unilaterally reassign routes based on driver complaints, he can work with load planners to address such issues. *Id.* at 29:24-30:9. He and a "safety guy" on site send out messages to drivers reminding them to complete quarterly training. *Id.* at 16:24-17:18. While he does not personally have the authority to hand out discipline, he does issue verbal warnings/write-ups and, for more serious discipline, he can pass recommendations on to his supervisor. Sometimes these are followed, and sometimes not. *Id.* at 19:13-21:5. He testified that "every decision [he] make[s] [he] make[s] with the company in mind. The decision making process needs to be made looking at possible ramifications to the company. [His] job is to make the company succeed and grow." *Id.* at 27:1-27:14. In this vein, he explained that he uses discretion to solve problems that the customer brings to him – even doing creative things like using freezer trailers as temporary freezers for Wal-Mart stores when their on-site freezers break.

*Id.* at 21:16-23:17. He sometimes has suggested new ideas to higher-level management and, on at least one occasion, his ideas were implemented. *Id.* at 42:9-44:5.

Brown, by his own testimony, uses discretion and independent judgment as a fleet manager at Werner.

JOHN CANNON

John Cannon was a dedicated manager at Werner but, in 2010, voluntarily stepped down to fleet manager. (Doc. 121, Ex. 4, Cannon Depo. at 6:1-6:7). As this lawsuit only concerns fleet coordinators/managers, the Court will not consider evidence regarding what he did as a dedicated manager. Cannon summarized his duties as a fleet manager as being a liaison between drivers and departments that can solve whatever issues the driver is having. *Id.* at 40:19-40:23. He testified that he communicates with drivers about DOT hours and works with planners and other personnel to, if necessary, repower loads in the event of delays or other incidents. *Id.* at 41:15-43:14, 44:14-44:23. He helps to deal with breakdown issues by communicating with Werner's breakdown department. *Id.* at 43:15-44:6. He has some limited communication with the customer. *Id.* at 44:24-45:9. He communicates with drivers regarding quarterly safety training. *Id.* at 45:17-46:4. According to his testimony, however, he does not appear to use appreciable discretion in accomplishing those tasks; rather his testimony was essentially that he refers the concern or issue to the appropriate department for disposition. *Id.* at 40-19-46:4. But he does use discretion in other ways. For instance, while Cannon does not, unilaterally, mete out serious disciplinary consequences, he does verbally discuss problems with drivers, issues written warnings, initiates and participates in disciplinary meetings with higher management – giving his opinion as to the ultimate resolution of the disciplinary question. *Id.* at 46:13-48:1. As another instance, because of his large number of years with Werner, he played an informal role in

33

recruiting and training – helping to identify qualified drivers. *Id.* at 65:4-70:11, 77:21-79:13. For similar reason, and, in part because of his experience as a truck driver, he ends up taking something of a leadership role in the office – helping his fellow fleet managers and building morale. *Id.* at 85:22-90:4.

Though Cannon is a much closer case than Brown or Wade, the Court finds no genuine issue of material fact as to his discretion on matters of significance. His role in discipline, though he lacked unilateral hiring and firing authority, seems to have been rather more pronounced than some of the other plaintiffs. He, though somewhat unofficially, clearly helped recruit drivers and train other fleet managers/coordinators. In addition, he informally led the office when the dedicated manager was away. Considered as a whole, his testimony demonstrates no genuine issue of material fact as to whether he exercised discretion and independent judgment with respect to matters of significance.

ROBERT COOK

Robert Cook was a night fleet coordinator at Werner's headquarters in Omaha. (Doc. 121, Ex. 6, Cook Depo. at 6:19-7:11). While working as a night fleet coordinator, he managed boards of trucks, matched up trucks with loads, made sure loads were "first in, first out" and had "free rein" to switch things around to keep everything moving on time. *Id.* at 21:13-22:5. Essentially, he just picked up where the day fleet manager left-off. *Id.* at 22:6-23:9. He had to assign loads sometimes if they were not already assigned during the day or if unexpected events, like an overweight load, a load not ready to ship, or a broken truck, forced such a change. *Id.* at 24:2-25:12. He recognized that in spite of the relatively good organization of shipping at Werner, sometimes "things would fall apart" and he would have to "improvise" and get trucks from other regions and develop solutions to delivery problems on his own. *Id.* at 31:2-33:25.

Moreover, Werner's shipping system, a bi-directional truck relay of sorts, required improvisation and load switching in order to make sure the pipeline moved smoothly. *Id.* at 29:10-31:1, 34:1-35:7. In addition to the macro-logistical, Cook used creativity and discretion to solve minor issues, such as giving drivers guidance about load/weight distribution within a truck and approving lumper pay up to a certain preset maximum. *Id.* at 39:1-41:8. Cook had some limited contact with customer representatives. *Id.* at 35:8-36:3. He did not discipline drivers but could and, apparently did, pass on relevant information to the fleet manager to deal with during the day. *Id.* at 29:2-29:9.

Cook, by his own testimony, used discretion and independent judgment to accomplish the complicated task of running a truck-relay. While he apparently lacked some of the managerial functions that Wade exercised, the "free rein" and other discretion he employed while fulfilling his fleet coordinator duties is sufficient (along with the other manageresque duties discussed above) to convince this Court there is no genuine issue of material fact that Cook used discretion and independent judgment with respect to matters of significance.

JOSEPH OGIER

Joseph Ogier was a fleet manager at Werner in their Phoenix office. (Doc. 121, Ex. 12, Ogier Depo. at 7:24-8:1, 25:23-26:1). His job, he said, was to oversee a fleet of 65-70 trucks and act as a point of contact for the drivers to help them resolve problems they may have during the day. *Id.* at 27:2-27:11. In this capacity he worked with load planners and fleet supervisors to make sure loads were delivered on time, repowering or reassigning as necessary. *Id.* at 27:21-29:7. Ogier also worked with customers, either directly or through the marketing department, to arrange (and rearrange in the event of delays) pick-up and delivery times. *Id.* at 29:17-33:3. He testified, however, that the fleet supervisor was the one who made the decision (without even a

35

recommendation from Ogier) about how to proceed on questions like whether to repower a load. *Id.* at 28:10-28:18. Though Ogier emphasized the necessity of communicating with his supervisor, he admitted that he, at least sometimes, played a role in decisions. *Id.* at 33:4-33:14. In addition, he admitted that, in deciding what to do about a problem, he would consider factors such as whether the delayed load was a priority and, depending on those factors, would look at different options; though he again stressed that the ultimate decision about what option to take would typically come from the supervisor. *Id.* at 35:4-36:1. Notwithstanding this somewhat mixed testimony on his own decision-making authority, Ogier testified that he helped to guide new drivers by answering their questions. *Id.* at 43:12-45:3. He also monitored DOT hours in order to make sure no fatigued (and therefore, unsafe) drivers were on the road. *Id.* at 45:16-47:3. Indeed, he specifically said that he was able to order drivers to stop driving who had exceeded their DOT hours. *Id.* at 49:18-49:22. Though stating that he played no role in terminating a driver, Ogier acknowledged that he played a role in discipline by writing up drivers and counseling them. *Id.* at 40:1-40:20. He acknowledged moreover, that enough write-ups by him regarding a driver could result in termination for the driver and, that in at least one case, a driver was terminated based on his write-ups. *Id.* at 40:21-41:15. He acknowledged that he had the ability to approve vacations and home time off requests by drivers but noted that his was not the final say and the supervisor could reverse his approval. *Id.* at 47:4-48:11.

It is clear that Ogier employed discretion with respect to matters of significance. In addition, he played a role in training and discipline. In fact, on at least one occasion, a driver was fired based entirely on Ogier's write-ups. There is no genuine issue of material fact as to whether Ogier exercised discretion and independent judgment with respect to matters of significance.

36

NEIL KITCHEN

Kitchen began as a fleet coordinator in Werner's vans division at the Omaha headquarters. (Doc. 121, Ex. 11, Kitchen Depo. at 9:3-9:23). However, after a short time he made a lateral move to work on a dedicated Staples account in Georgia, again, as a fleet coordinator. *Id.* at 9:24-11:12. While there he implemented shipping plans, kept track of DOT hours, communicated with drivers, arranged repowers when necessary, redistributed loads, and dealt with other driver issues like absenteeism. *Id.* at 11:23-16:5. However, during his deposition, Kitchen testified, in conflict with his prior statements about the scope of his job, that he was merely a conduit between drivers and higher management and that he made no independent decisions at all. *E.g., id.* at 11:23-16:5, 65:17-68:3. In fact, he testified that his prior affidavit (which was largely contradicted by his deposition testimony and signed before he opted into this lawsuit) was not, in significant part, true and was something he was forced to sign. *Id.* at 17:23-20:8, 22:11-22:17.

There is, therefore, an issue of fact about whether Kitchen exercised discretion while working on the dedicated Staples account in Georgia. In other circumstances where a party's sworn statements conflict, the Court might be inclined to hold that the party's first statement controls the matter and later attempts modify his former version of the truth should not create a genuine issue of fact sufficient to withstand summary judgment.[13] *E.g., United States ex rel. Compton v. Midwest Specialties*, 142 F.3d 296, 303 (6th Cir. 1998). However, here, the affidavit in question was obtained from Kitchen (at that time a potential plaintiff) by Werner (Kitchen's

---

[13] Kitchen's deposition testimony also contradicts unsworn remarks, apparently written by Kitchen, in an internal Werner resume. (Doc. 124, Ex. NN, Kitchen Res.). While this can doubtless be used to impeach Kitchen in a proceeding before a fact-finder, no authority that this Court is aware of would empower it to ignore Kitchen's conflicting deposition testimony in favor of the prior unsworn statements for purposes of granting summary judgment.

employer) without Kitchen being represented by independent counsel. (*See* Doc. 124, Ex. GG, Kitchen Aff.). Though this Court does not find that Werner acted unethically in obtaining this affidavit, neither will the Court assume that Kitchen's statements in the affidavit reflect the unvarnished truth – free from any implicit coercion by Werner or influence (even unintentional) by the attorney obtaining the affidavit. *See, e.g., Sjoblom v. Charter Commc'n, LLC*, No.: 3:07-cv-451, 2007 U.S. Dist. LEXIS 94829, *9 (W.D. Wisc. Dec. 26, 2007) (citing *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 294, 298 (D. Mass. 2004)) (noting, in the context of affidavits gathered by an employer from potential plaintiffs in order to resist an employment class action that "the employment relationship is inherently coercive"). Under the circumstances here, Kitchen's disagreement with the affidavit creates a genuine issue of material fact.

In time, Kitchen became a fleet manager for Best Buy. (Doc. 121, Ex. 11, Kitchen Depo. at 49:9-49:14). Despite his prior insistence on his lack of managerial function when working on the Staples account, he did admit that as a fleet manager he took a more active role in management and described his management and decision-making style. *Id.* at 46:7-46:10, 47:14-51:15. In fact, he specifically discussed his decision-making abilities in managing drivers, stating that he was working to find a balance between deciding issues quickly and "slow[ing] down and [considering] all the alternative options and weigh[ing] the pros and cons of each before implementing a solution." *Id.* at 50:8-51:15. Indeed, despite his self-assessed need to slow down his decision-making process, his supervisors praised his problem-solving ability and Kitchen testified that the praise was accurate. *Id.* at 52:4-52:11. He never, however, played any role in disciplining and counseling drivers other than compiling reports on how long trucks remained idle, how many miles per gallon drivers got, and whether they went out of their route. *Id.* at 56:9-58:15. These reports, he said, were something he did in his own discretionary

initiative, not something he was required to do. *Id.* at 64:3-64:11. In his final period at Werner, Kitchen worked on a Wal-Mart account in Indiana. *Id.* at 79:12-79:20. During that period he performed approximately the same duties as he had as fleet manager for the Best Buy account. *Id.* at 80:6-80:10.

With respect to his duties as a fleet manager for Best Buy and Wal-Mart, the undisputed record, as testified to by Kitchen, reflects that he used discretion and independent judgment in matters of significance.

MATHEW BREWER

Mathew Brewer succeeded Malcolm Wade as the fleet coordinator at the Staples-dedicated facility in London, Ohio and, like Wade, was the only Werner representative on site. (Doc. 121, Ex. 2, Brewer Depo. at 14:16-15:7, 22:16-22:24). However, Brewer did not schedule to the same extent that Wade had because a schedule layout already existed when he succeeded Wade. Nonetheless, he did assign loads and, though it did not happen frequently, could change load assignments to accommodate Staples' requests. *Id.* at 21:12-22:1. Confusingly, Brewer also testified that drivers did not have to accept the loads he assigned them. *Id.* at 22:1-22:4. How schedules or load assignments could be meaningful if drivers could decline loads is not explained in the deposition. Nor does the confusion end there. Brewer also testified that though he monitored DOT hours, it was up to the driver what to do once they ran out. If the driver continued to drive then, Brewer said, they continued. Only if they chose to stop driving did Brewer attempt to arrange other trucks to deliver the loads. *Id.* at 23:11-24:16. Finally, though he succeeded Wade – working in the same position in the same facility – Brewer testified that, unlike Wade, he lacked authority to punish drivers. *Id.* at 27:6-27:9.

Brewer's testimony conflicts with an affidavit and performance review generated prior to Brewer becoming a plaintiff. *See, e.g., id.* at 26:23-27:9, 51:22-54:18.   However, when considering summary judgment, the Court is not engaged in weighing credibility, and Brewer's non-conclusory assertions about what he did and did not do during his tenure with Werner must therefore be weighed by a fact-finder to ascertain their truth.   Questions of fact exist as to whether Brewer exercised discretion and independent judgment.

JOSEPH CASPER

Joseph Casper was employed at the headquarters Omaha office of Werner as a dedicated night fleet coordinator. (Doc. 121, Ex. 5, Casper Depo. at 6:19-7:8).  Casper tracked the timing of loads and relayed communications to the appropriate department regarding accidents, pay issues, or other driver issues. *Id.* at 26:6-27:21.  He did not track DOT hours. *Id.* at 45:17-45:21. Casper testified that he, more than most of the other employees deposed, would note problems and pass the buck rather than solving them himself. *See, e.g., id.* at 31:25-35:11, 39:6-39:14. 46:6-46:14.  In fact he testified, "Basically I was just there to comfort [the drivers.]  It sounds bad, but really it's the truth." *Id.* at 33:11-33:13.  Casper did admit to having exercised some discretion and problem-solving intelligence about whom to contact based on information given to him by the drivers when the drivers encountered issues. *Id.* at 39:15-39:22.  But that was, according to him, the extent of his discretion.

Casper was in charge of dispatching more than 400 trucks spread across the 48 states, many more, and over a bigger geographical area, than most of the other deposed plaintiffs. *Id.* at 34:21, 38:21-39:2.  This may explain why his job, at least according to his testimony, more closely resembles a traditional dispatcher – routing communications to the appropriate places – than an administrator or manager who might exercise discretion over any number of subjects.

Under these circumstances, it might seem that Casper is entitled to a judgment as a matter of law that he is not exempt. However, when one considers the testimony of Werner's witnesses about the duties of a fleet manager, it becomes apparent that Casper's testimony conflicts with theirs as to the extent of his responsibilities. *See supra* pp. 14-19. It will therefore be up to a fact-finder to decide whether Casper's description of his job, or Werner's management's testimony about what persons in his job do, is the more credible.

STEPHEN DEAN

Stephen Dean was a fleet manager for some of his time at Werner at the dedicated Anheuser-Busch location in Columbus, Ohio. (Doc. 121, Ex. 7, Dean Depo. at 5:5-5:8). When on the job as a fleet manager, he kept up with absenteeism and passed that information along to the dedicated manager. *Id.* at 19:11-19:17. He acted as a liaison between the drivers and upper management and other resources. *Id.* at 19:24-20:3. Specific tasks included investigating instances where loads were delayed, relaying driver concerns about payroll issues, and working with the load planner and dedicated manager to give drivers requested time off. *Id.* at 20:4-22:11. He acted as a contact between the drivers and the load planner to solve issues related to DOT hours. *Id.* at 24:11-25:23. If drivers judged it unsafe to continue to drive, he would relay that message to the load planner or dedicated manager so it could be passed on to the customer; direct contact with the customer was rare and mostly happened in the mornings when he was the only one in the office. *Id.* at 25:24-27:11. Dean did send out the occasional safety bulletin and remind drivers about their quarterly safety training, working with the load planner to make sure that the drivers had the hours in which to complete the training, but there was a safety supervisor on site whose job encompassed most of the safety-oriented tasks. *Id.* at 28:11-31:15. He was not responsible or empowered to discipline drivers, but he could, and did, speak to them about issues

41

(especially tardiness) and would follow-up with the dedicated manager. *Id.* at 33:1-34:8.  Dean never actively trained drivers, but once or twice per year the dedicated manager would assign new trainees to shadow him – watch him do his job for an hour or more. *Id.* at 62:9-63:2.

Although the caselaw generally demonstrates that dispatchers are often exempt when their duties expand beyond the traditional communication duties of dispatchers and into the realm of management, as the regulations show and as the *Alvarez* case exemplifies, discretionary actions or judgments are still a prerequisite to the administrative exemption. 541 F. Supp. 2d 1308.  That is, Alvarez might have locked up at night, taken care of security dogs, cleaned and repaired computers and desks, and washed cars – all duties that went beyond stereotypical dispatcher tasks – but there was no undisputed evidence that he exercised any level of discretion as to any significant matter. *Id.* at 1309-10.  The same is true of Dean.  True, communicating with drivers about tardiness and then following up with the dedicated manager is a duty that is reminiscent of managerial action, but Dean does not anywhere admit to exercising discretion.  Rather, in almost every instance he testified that he acted as a liaison, a link in a chain of communication.  Although Werner's witnesses would doubtless take issue with his factual recitation with regard to his duties, that conflict of evidence cannot be resolved via summary judgment.

There is a genuinely disputed question of fact about whether Brewer, Casper, Dean, and Kitchen (with respect his employment on the Staples-dedicated account) exercised discretion and independent judgment with respect to matters of significance.  Wade, Brown, Cannon, Cook and

Ogier, by their own testimony, drawing all inferences in their favor, and as a matter of law, exercised discretion and independent judgment with respect to matters of significance.[14]

### ii.    (a)(2) – Primary Duty of Non-Manual Office Work Directly Related to Management or General Business Operations

As mentioned, the Plaintiffs' primary duty was overseeing trucks and the evidence shows that this constituted non-manual office work. *See supra* pp. 4-13, 30-41. Specifically, Plaintiffs worked in offices or cubicles using a telephone and a computer. (*See, e.g.*, Doc. 121, Ex. 15. Wade Depo. at 41:16-41:21 (describing his work space as an office he sometimes shared with a

---

[14] Troy Sohn by his own admission, remembers little about his brief stint with Werner. (*See, e.g.*, Doc. 121, Ex. 14, Sohn Depo. at 15:6-15:8, 17:16-18:3). He is not even sure if he was hired as a night fleet coordinator or a customer service manager. *Id.* at 8:8-8:13. Sohn, for instance, testified about his job duties as follows:

> Well, the -- I remember at -- usually at the beginning of each shift when I got there, and a couple times throughout the shift, I would get faxes from customers that wanted whatever shift and -- and there was a -- I think there was a driver assigned to it on that he fax, and I would just have to monitor that load and make sure it got to the destination.
>
> . . . .
>
> You know, from what I remember, I dealt mainly with the customer. But, I mean, if a driver was somewhere that they thought they were going to be delayed, I think they called, but it didn't happen very often, I know that.
>
> . . . .
>
> You know, I don't think [breakdown issues] ever came up for me. And I don't know if they would have. I really can't remember. When I got that job, it was like I was very, you know, unsure of what to do because I got like two weeks of training is all. And the guy that I worked with handled most of that stuff. I think -- it's been so long, I honestly cannot say.
>
> . . . .
>
> Well, I would have to put [customer load pickup requests] in the computer and -- it's very fuzzy, but I would have to do that and -- I can't remember if it was assigned to a driver or if I had to call the driver or email him, or whatever we did, and let him know that -- I don't think I ever had to call a driver. But I think it was already set up and the driver had -- it's just hard for me to remember. I know I monitored the load.

*Id.* at 16:16-19:10.

Werner has moved for summary judgment and has presented evidence by employees who are or were employed as fleet coordinators/managers, dedicated managers, associate vice presidents, and vice presidents. *See supra* pp. 13-18. Their testimony is evidence that employees performing night fleet coordinator duties are exempt. Sohn's testimony, if he was a night fleet coordinator, is insufficiently definite to raise a genuine issue of material fact in the face of Werner's evidence. If, on the other hand, Sohn's memory that he might have been hired as a customer service manager is correct, Sohn is not properly a part of the class or this litigation. In either case, he shall be dismissed from this litigation.

shipping clerk); Doc. 121, Ex. 6, Cook Depo. at 7:12-7:20 (describing his office as one cubicle in a row of cubicles)).

Thus, the important question for this factor is whether Plaintiffs' primary duty at work directly related to the management or general business operations of Werner.

> The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a) (2014). In other words, work is "directly related to management or general business operations" if it includes, for example, "work in functional areas such as . . . quality control; . . . safety and health; personnel management; . . . legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). It can also include work "directly related to the management" of the customers. 29 C.F.R. § 541.201(c).

Even disregarding the deponents who ostensibly testified for Werner, the testimony in the record demonstrates that Plaintiffs' primary duties played a role in quality control. Specifically, their primary responsibility was overseeing truck fleets to ensure that deliveries were completed safely and on time. *Supra* pp. 4-13, 30-41. Wade, in fact, testified that under his management, on time safe deliveries improved at the London, Ohio, Staples location from 90% to 99.6% and that he received bonuses based on this improvement. (Doc. 121, Ex. 15, Wade Depo. at 62:3-63:12, 69:6-70:7, 74:2-76:11, 123:19-124:13).

Although the plaintiffs were not part of the safety department at Werner, their work likely had at least some small impact on safety. *Supra* pp. 4-13, 30-41. Wade, for instance, posted safety notices about chocking wheels and reminded drivers to do their preventative maintenance as well as quarterly safety training. (Doc. 121, Ex. 15, Wade Depo. at 33:13-33:17, 50:18-51:18,

120:9-121:5). If drivers did not complete their quarterly safety training, moreover, Wade would remove them from the schedule. *Id.* at 102:1-102:17.

Although all deponents acknowledged that Plaintiffs did not have unilateral authority to hire or fire, most plaintiffs who were deposed (Wade, Brown, Cannon, Cook, Ogier, and even Brewer and Dean) agreed that they wrote-up, counseled, or made reports about drivers who misstepped though, in some cases, they were reluctant to call the activity disciplining. *Supra* pp. 4-13, 30-36, 38-41. Accordingly, one functional area into which Plaintiffs' primary duties reached was personnel management.

In addition, Plaintiffs tracked DOT hours (through use of an automated system) and, when drivers exceeded such hours, would order them to stop driving and, if necessary, make other relevant arrangements. *Supra* pp. 4-5, 7-8, 12-13, 30-33, 35-36 (particularly Wade, Cannon, and Ogier testified in this manner). Thus, their primary duties had a legal and regulatory compliance functional area also.

Plaintiffs' primary duty, overseeing trucks and truck drivers operating within their jurisdiction during their shift, was non-manual office work directly related to the management and business operations of Werner. Accordingly, as they also satisfy parts (a)(1) and (a)(3) of 29 C.F.R. § 541.200, there is no genuine issue of material fact that Wade, Brown, Cannon, Cook, Ogier, and Kitchen (with respect to his employment with the Staples-dedicated location) are exempt under the administrative exemption as a matter of law.

### b. The Executive Exemption

(a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

> (1) Compensated on a salary basis at a rate of not less than $ 455 per week . . .
> ;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100 (2014). Based on the facts analyzed at length above, none of the remaining plaintiffs, Brewer, Casper, Dean, and Kitchen, when regarding the record in the light most favorable to them, meets this exemption. Though they were all compensated on a salary basis at a rate above $455.00 per week, none managed Werner or "a customarily recognized department or subdivision thereof," none "direct[ed] the work" of any drivers that they tracked and none had authority to hire or fire (though there is some evidence that their recommendations in this regard would have been considered). *See, supra* pp. 36-42. There are also other facts that, while not part of the § 541.100 analysis, make the title "executive" seem somewhat ill-fitted to Plaintiffs. For instance, Plaintiffs earned in the neighborhood of $40,000 per year and were not required to have any post-high school degree. (*See, e.g.* Doc. 121, Ex. 2, Brewer Depo. at 16:10-16:19 (two-week salary $1,538.46); Doc. 121, Ex. 5, Casper Depo. at 12:5-14:6 (two-week salary $1,538.84 plus occasional bonuses in the $750 range); Doc. 124, Ex. III, Casper Res. at 1 (showing college attendance but no degree); (Doc. 124, Ex. NN, Kitchen Res. at 1 (showing college attendance but no degree)). However, regarding the exemption in the light most favorable to Defendant, reveals factual disputes between what Defendant's witnesses say fleet coordinators/managers did, what Plaintiffs (in internal resumes and affidavits) said they did, and what Plaintiffs now say they did. *See supra* pp. 14-19; (Doc. 124, Exs. F, Q, X-Y, FF-GG, KK-NN, RR, TT, VV-YY, III).

46

Though it is a close question, the factual questions about what Plaintiffs actually did in their jobs need to be resolved by a fact-finder.

### c. The Motor Carrier Act Exemption

There appears to be no dispute that Werner is a private motor carrier whose transportation activities are subject to the Motor Carrier Act. (*See, e.g.*, Doc. 124, D. Memo in Supp. of SMJ at 44 (arguing that Werner is a motor carrier subject to the Act); Doc. 138, P. Re. in Opp. to SMJ (not disputing that Werner is subject to the Act, but arguing that Plaintiffs do not fit the exemption)). However, the Motor Carrier Act exemption argued by the parties in this case "is applicable, under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2 (2014) (citing *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947); *Levinson*, 330 U.S. 649; *Morris v. McComb*, 332 U.S. 422 (1947)).

Taking the view of the evidence most favorable to Brewer, Casper, Dean, and Kitchen, none of them was involved in work as a driver, drivers' helper, loader, or mechanic, nor did any of their duties directly affect the safety of the trucks they oversee. *See supra* pp. 36-42; *see also* 29 C.F.R. §§ 782.3-782.6 (2014) (defining drivers, drivers' helpers, loaders, and mechanics in a way that excludes plaintiffs). Thus, summary judgment is not due to Defendant on this ground.

On the other hand, taking the view of the evidence most favorable to Werner, everyone at Werner is responsible for safety and Plaintiffs tracked DOT hours, posted safety notices, reminded drivers about safety trainings, checked truck inspections, and engaged in other such activities. *See, supra* pp. 4-19. True, Plaintiffs job titles are fleet manager and fleet coordinator,

47

not driver, driver's helpers, loader, or mechanic but Werner argues that "neither the name given to [a potential claimant's] position nor that given to the work that he does is controlling; what is controlling is the character of the activities involved in the performance of his job." 29 C.F.R. § 782.2(b)(2) (citations omitted).   Werner is correct insofar as an employee may be exempt, whatever his title, if he "engage[s] in activities of a character directly affecting the safety of operation of motor vehicles . . . ." 29 C.F.R. § 782.2(a).  However, Werner, citing *McIntyre v. FLX of Miami, Inc.*, reads this principle too broadly; Werner's interpretation would exempt anyone, even a dispatcher, whose job tangentially affects safety, whether or not they fall within the four job classes set forth by the regulations. No.: 08-cv-20030, 2008 U.S. Dist. LEXIS 85582, *16-19 (S.D. Fla. Oct. 8, 2008).[15]   The exemption is not so broad as that.  "The U.S. Supreme Court has accepted the Agency determination, that activities [directly affecting safety] are included in the kinds of work which has been defined as the work of drivers, driver's helpers, loaders, and mechanics (see §§ 782.3 to 782.6) employed by such carriers, and that no other classes of employees employed by such carriers perform duties directly affecting such 'safety of operation.'" 29 C.F.R. § 782.2(b)(1) (emphasis added); *see also Verdi v. Domino Logistics Co.*, 1:10-cv-1888, 2011 U.S. Dist. LEXIS 65326, *5-6 (N.D. Ohio June 16, 2011) (finding, as a matter of law, that plaintiffs were not exempted from the FLSA by the Motor Carrier Act exemption where they were not employed as any of the four classes – drivers, driver's helpers, loaders, or mechanics).  Thus the question is, did Plaintiffs, whatever their titles, engage in the duties accorded to those four classes?

---

[15] *McIntyre* appears to be something of an aberration.  First, the dispatcher there performed duties reminiscent of a mechanic, checking tires, oil, and inspecting vehicles. *McIntyre*, 2008 U.S. Dist. LEXIS 85582, *2-3, *17.  Second, *McIntyre*, was decided against a dispatcher who submitted no evidence on summary judgment, relying instead on assertions that the defendant's evidence was "not enough to warrant the wishes of [the] motion to grant a Summary Judgment" and that "[t]his case needs to be heard out before a fair tribunal and the merits awarded accordingly." *Id.* at *4.  *McIntyre* should be read as limited to its facts and not as a license to ignore the four categories, "drivers, driver's helpers, loaders, and mechanics" set forth in the Code of Federal Regulations.

In order to be a "driver" one must drive. *See* 29 C.F.R. § 782.3 (defining "driver" for purposes of the Motor Carrier Act). Plaintiffs, it is undisputed, did not. *See supra* pp. 4-19. In order to be a "driver's helper," one must "ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.4 (defining "drivers' helpers"). Plaintiffs do not ride on the trucks; they sit at desks in front of computers and answer phones. *See supra* pp. 4-19. In order to be a loader one must physically load the truck, exercising judgment and discretion in planning and building a balanced and secure load or "plan[] and immediately direct[] the proper loading of a motor vehicle as described . . . ." 29 C.F.R. § 782.5 (defining "loaders"). Plaintiffs did no manual labor at all and, on the rare occasion that they helped balance a load, the way they helped was by giving general advice or arranging for the truck to return and be reloaded by someone else. (*See, e.g.*, Doc. 121, Ex. 15, Wade Depo. at 42:2-42:15; Doc. 121, Ex. 3, Brown Depo. at 49:10-49:17; Doc. 121, Ex. 5, Casper Depo. at 44:10-44:19 (mentioning ways of dealing with driver complaints about unbalanced loads, none of which involve physically loading or even directly managing loading of a trailer)). There is no evidence whatsoever in the record that the Plaintiffs ever micromanaged where to stack this box or that box as is contemplated by § 782.5. *Supra* pp. 4-19. Finally, in order to be a mechanic in this context one must physically repair trucks so as to keep them in safe working condition or one must, as a supervisor to a mechanic, plan such work, immediately direct it, and check the proper performance of a person engaged in this work. 29 C.F.R. §782.6(a, b). There is no evidence in the record to suggest that plaintiffs ever did anything of this character or that they even had the requisite knowledge of diesel engines and truck repair to perform such work. *See supra* pp. 4-19. Moreover, some of the work Plaintiffs do (dispatching), is specifically mentioned as not meeting the Motor Carrier Act exemption. 29

49

C.F.R. § 782.6(c)(1) ("Activities which do not directly affect such safety of operation include those performed by employees whose jobs are confined to such work as that of dispatchers . . ."); *see also Benson v. Universal Ambulance Service, Inc.*, 675 F.2d 783, 786 (6th Cir. 1982) (finding it "questionable . . . that . . . dispatchers affect the safety of operation of the vehicle").

Plaintiffs are entitled to partial summary judgment – they are not, by reason of the Motor Carrier Act exemption, exempt from the FLSA.[16]

## C. Motion to Dismiss

Werner requests that this Court dismiss 56 plaintiffs[17] who, it says, have not responded to its written requests for discovery. (Doc. 112, D. Mot. to Dis. *in passim*). Plaintiffs respond that Werner was not entitled to discovery from every class member, that it already received discovery from half the class and deposed approximately 10% of it, and that, in any case, dismissal is a sanction of last resort, to be imposed only after warnings and lesser sanctions have failed. (Doc. 115, P. Re. in Opp. to Dis. *in passim*). Werner responds that, due to the fact-intensive nature of the issues in this case and relevant differences in putative class members, Werner will be prejudiced if class members who have not participated in discovery are not dismissed and allowed to participate in a "trial by ambush." (Doc. 116, D. Reply in Supp. of Dis. at 6 & *in passim*).

This Court has previously recognized that "there are two lines of cases regarding individualized discovery in opt-in class actions. One holds that individualized discovery is not appropriate in a Rule 23 class action and, by analogy, inappropriate in a Section 216(b) class

---

[16] The Court previously explained that, because the record discloses meaningful differences in the extent of the discretionary duties performed by Plaintiffs, this Order's reach is limited to the 10 deposed plaintiffs: Wade, Brewer, Brown, Cannon, Casper, Cook, Dean, Kitchen, Ogier, and Sohn. *See supra* pp. 3-4. The Court holds to this limitation but notes that unless the remaining plaintiffs differ radically from these 10 with respect to whether they drove, rode upon, repaired, or loaded trucks, a similar conclusion is likely to be reached as to them also.

[17] In its reply, Werner requests dismissal of 57 opt-in plaintiffs. (Doc. 116, D. Reply in Supp. of Dis. at 7). Werner does not specify which additional plaintiff should be dismissed.

action. Other cases permit individualized discovery of opt-in plaintiffs." *Gentrup v. Renovo Servs., LLC*, No.: 1:07-cv-430, 2010 U.S. Dist. LEXIS 143203, *11-15 (S.D. Ohio Aug. 17, 2010) (citing & comparing *Renfro v. Spartan Computer Servs.*, No.: 06-cv-2284, 2008 U.S. Dist. LEXIS 13194, *5-6 (D. Kan. Feb. 19 2008); *Coldiron v. Pizza Hut, Inc.*, No.: 03-cv-5865, 2004 U.S. Dist. LEXIS 23610, *6-7 (C.D. Cal. Oct. 25 2004); *Abubakar v. City of Solano*, No.: 06-cv-2268, 2008 U.S. Dist. LEXIS 17456, *5, *10 (E.D. Cal. Feb. 22, 2008); *Krueger v. New York Tel. Co.*, 163 F.R.D. 446, 452-53 (S.D.N.Y. 1995); *Rosen v. Reckitt & Colman, Inc.*, No.: 91-cv-1675, 1994 U.S. Dist. LEXIS 16511, *11-12 (S.D.N.Y. 1994); and *Brooks v. Farm Fresh, Inc.*, 759 F. Supp. 1185, 1188 (E.D. Va. 1991) (all allowing discovery from all class members), with *Bradford v. Bed Bath & Beyond*, 184 F. Supp. 2d 1342, 1344 (N.D. Ga. 2002); *In Re: Am. Family Mut. Insur. Co.*, No.: 06-cv-17430, 2009 U.S. Dist. LEXIS 39383, *8 (D. Colo. Apr. 27, 2009); *Cranney v. Carriage Servs, Inc.*, No.: 2:07-cv-1587, 2008 U.S. Dist. LEXIS 113606, *13-17 (D. Nev. June 16, 2008); and *Belcher v. Shoney's Inc.*, 30 F. Supp. 2d 1010, 1024-25 (M.D. Tenn. 1998) (all finding representative discovery, rather than discovery from each class member, permissible)). This Court has also observed, "It is in this Court's discretion to determine what line of cases is most applicable to the specific facts of the instant case." *Gentrup*, 2010 U.S. Dist. LEXIS 143203, *15; *see also Smith v. Lowe's Home Ctrs.*, 236 F.R.D. 354, 357-58 (S.D. Ohio 2006).

Here, as the lengthy summary judgment discussion above shows, there are, at least according to Plaintiffs' evidence, important differences amongst a 10-person sampling of the putative class. It stands to reason, therefore, that there are likely important differences amongst both the class members about whom the Court knows very little (those who have not been deposed but have only responded, often in minimalist fashion, to interrogatories) and the class

members about whom (because they have not responded to discovery) the Court knows nothing at all.  Under these circumstances the Court shall allow Werner to obtain discovery regarding each member of the entire class – both to determine if there is a class, and to determine if each proposed member is exempt.

The Court has not previously issued an order authorizing or compelling discovery from all class members.  As such, dismissal at this juncture for the failure of all Plaintiffs to completely respond is not appropriate. *See, e.g., Patton v. Aerojet Ordnance Co.*, 765 F.2d 604, 607 (6th Cir. 1985) (explaining that dismissal is a sanction of last resort).  However, this Court hereby does, and therefore now has, issued an order informing Plaintiffs that each and every one of them is to respond, in full and informative detail, to Werner's interrogatories, requests for admission, or requests for production.  With this in mind, as well as the entirety of this Opinion, the parties shall be prepared to discuss at the upcoming settlement conference any further discovery in this case.

## IV.  CONCLUSION

Plaintiffs' motion to strike (Doc. 135) is **DENIED**, Plaintiffs' motion for summary judgment (Doc. 122) is **GRANTED in part and DENIED in part**, Defendant's motion for summary judgment (Doc. 123) is **GRANTED in part and DENIED in part**, and Defendant's motion to dismiss (Doc. 112) is **DENIED**.

Summary judgment is granted against Plaintiffs Wade, Brown, Cannon, Cook, and Ogier.  Plaintiff Kitchen is exempt in respect to his work on the Best Buy and Wal-Mart accounts.  In all other respects, summary judgment against Kitchen is denied.  Summary judgment is also denied as to Plaintiffs Brewer, Casper, and Dean because questions of fact exist regarding the extent to which they exercised discretion in their job duties.  Plaintiffs Wade, Brewer, Brown, Cannon, Casper, Cook, Dean, Kitchen, Ogier, and Sohn are entitled to partial summary judgment insofar

as they are not exempt from the FLSA by reason of the Motor Carrier Act exemption.  The Court does not decide that issue as to the remaining plaintiffs at this time.  Plaintiff Sohn is dismissed from this action as he is either not properly a member of the class or, if he is, did not present evidence sufficient to create a genuine issue of material fact in the face of Werner's evidence that he was exempt.

The Clerk is directed to **REMOVE** documents 112, 122, 123, and 135, from the Court's pending motions list.

As the parties are aware, this case is currently set for settlement conference on March 25, 2014.  The parties should come prepared to discuss settlement in accordance with the directions set forth in the Court's scheduling orders. (*See* Docs. 103, 131).  Though the Court understands that the parties may not have time, given the date of this Order, to fully incorporate the import of the Order into their confidential assessments, the parties should come prepared to orally address if and how their positions have changed in light of this Order.

**IT IS SO ORDERED.**

_____3 - 18 - 2014_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**